IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DAEVONNA MCFIELD, a minor by | : | CIVIL ACTION |
| and through her parent and natural | : | |
| guardian, Ravonnia Ray | : | |
| | : | |
| v. | : | |
| | : | |
| PHILADELPHIA HOUSING AUTHORITY, | : | |
| et al. | : | NO. 13-5284 |

MEMORANDUM

Dalzell, J.                                                    January 17, 2014

I.      **Introduction**

We consider here defendant Philadelphia Housing Authority's ("PHA") motion to dismiss plaintiff's second amended complaint pursuant to Fed. R. Civ. P. 12(b)(6).

Specifically, Daevonna McField, by and through her mother, Ravonnia Ray, brings this 42 U.S.C. § 1983 action against PHA, claiming that PHA violated her rights under the United States Housing Act, 42 U.S.C. § 1437, et seq. ("USHA" or "Housing Act"), the Lead-based Paint Poisoning Prevention Act, 42 U.S.C. § 4801, et seq. ("LBPPPA"), the Residential Lead-Based Paint Hazard Reduction Act (the "RLBPHRA"), 42 U.S.C. § 4851, et seq., and the Fifth and Fourteenth Amendments of the United States Constitution.  She also sues John Cassidy, her former landlord, asserting common law claims of negligence, recklessness, and breach of warranty.  PHA moves to dismiss on the ground that there is no private cause of action under the USHA, LBPPPA, or RLBPHRA.  PHA also contends there was no violation of plaintiff's due process or equal protection rights, no state actor affirmatively caused McField's injuries, and no customs or policies deprived her of federal rights.  Def. MTD at 4-5.

## II.     Standard of Review

A defendant moving to dismiss under Fed. R. Civ. P. 12(b)(6) bears the burden of proving that the plaintiff has failed to state a claim for relief, see Fed. R. Civ. P. 12(b)(6); see also, e.g., Hedges v. U.S., 404 F.3d 744, 750 (3d Cir. 2005).  As the Supreme Court held in Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007) and Ashcroft v. Iqbal, 556 U.S. 662 (2009), in order to survive a Rule 12(b)(6) motion, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face'", Iqbal, 556 U.S. at 678 (quoting Twombly, 550 U.S. at 570).  A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged", Iqbal, 556 U.S. at 678.

As our Court of Appeals has explained post-Twombly and Iqbal, when considering a motion to dismiss under Fed. R. Civ. P. 12(b)(6) the district courts must engage in a two-part analysis:

> First, the factual and legal elements of a claim should be separated. The district court must accept all of the complaint's well-pleaded facts as true, but may disregard any legal conclusions.  Second, a district court must then determine whether the facts alleged in the complaint are sufficient to show that the plaintiff has a 'plausible claim for relief.'

Fowler v. UPMC Shadyside, 578 F.3d 203, 210-11 (3d Cir. 2009).  We thus begin by reciting the facts as they appear in the second amended complaint (hereinafter "Comp.").  As most of the facts are not in dispute, we will identify disputes where they exist, and otherwise assume the parties agree on the facts as alleged.

III.   **Facts**

On or before June 1, 2006, pursuant to the Federal Housing Choice Voucher Program -- which falls under Section 8 of USHA ("Section 8 Housing Program")[1] -- PHA entered into a Housing Assistance Payment ("HAP") contract with John Cassidy, the owner and landlord of 2040 South 68th Street, Philadelphia, Pennsylvania, for that property.  Comp. ¶¶ 10, 12, 98.

On June 1, 2006, with the approval of PHA, plaintiff Ravonnia Ray entered into a two-year lease agreement with Cassidy for 2040 South 68th Street.  PHA approved the lease on June 1, 2006, and Ray renewed her lease two years later.  Comp. ¶¶ 98, 101.  Ray's daughter, Daevonna McField, was born on July 23, 2007, id. at ¶ 99.  When Ray renewed her lease it included a Lead-Based Paint Disclosure Addendum to Lease Statements that was binding on Cassidy.  Id. at ¶ 101.

On March 29, 2009, PHA conducted its annual inspection of 2040 South 68th Street and found that the property failed to meet the Housing Quality Standards ("HQS") for uncovered electrical outlets, broken windows and inoperable range burners.  Notably, there was no mention in the PHA report of lead paint hazards.  Id. at ¶¶ 103-04.  PHA conducted additional inspections on April 4, 2009, May 18, 2009, and May 20, 2009 to monitor remediation of the infractions it had identified, but Cassidy failed to make the required repairs.  Id. at ¶ 105.

On June 25, 2009 McField got a blood test that showed "dangerously elevated levels of lead in her bloodstream."  Id. at ¶ 107.  The results were sent to the Philadelphia

---

[1] The Section 8 Program, which the United States Department of Housing and Urban Development ("HUD") oversees, provides rent subsidies to help low- and moderate-income participants afford safe and sanitary housing, see, e.g., Massie v. U.S. Dep't of Housing and Urban Dev., 620 F.3d 340, 342 n.2 (3d Cir. 2010).

Department of Health ("DOH") which conducted an environmental inspection of 2040 South 68th Street on September 25, 2009 that found lead-based paint on over eighty surfaces and fixtures.  Id. at ¶¶ 109-110.  The DOH served an order on Cassidy on September 30, 2009 obliging him to eliminate the lead paint danger within ten days, but when DOH inspected the property on October 15, 2009, the problem remained.  Id. at ¶¶ 112-13.  On December 3, 2009 DOH again inspected the property and found Cassidy still non-compliant, and so mother and daughter relocated that month.  Id. at ¶¶ 115-16.

Plaintiff alleges that as a result of McField's exposure to lead paint, she has suffered permanent and incapacitating brain damage whose treatment requires frequent, painful medical examinations, which come at great expense to Ray.  Id. at ¶¶ 149-54.

Because of PHA's failure to identify the lead paint hazard, plaintiff reasons that PHA "either failed to conduct the initial inspection" in 2006 and "failed to conduct annual inspections" in 2007 and 2008, or it "failed to discover the multiple lead paint hazards . . . when it performed" the initial and subsequent inspections.  Id. at ¶¶ 140, 143.

## IV.    Discussion

### A.    Whether the USHA, LBPPPA, and RLBPHRA Provide Private Rights

#### 1.    Private Statutory Rights Sufficient To Confer Liability Under 42 U.S.C. § 1983

42 U.S.C. § 1983 provides a remedy for state actors' violations of individuals' constitutional and federal statutory rights.  See, e.g., Blessing v. Freeston, 520 U.S. 329, 340 (1997) ("Section 1983 imposes liability on anyone who, under color of state law, deprives a person 'of any rights, privileges, or immunities secured by the Constitution and laws.'").  As the United States Supreme Court explained in Gonzaga University v. Doe, 536 U.S. 273 (2002),

only "an unambiguously conferred right" can "support a cause of action brought under § 1983" and so "it is only violations of <u>rights</u>, not <u>laws</u>, which give rise to § 1983 actions".  <u>Id.</u> at 282-83 (emphasis in original).

In <u>Pennhurst State School and Hospital v. Halderman</u>, 451 U.S. 1 (1981), the Supreme Court explained that, "[i]n legislation enacted pursuant to the spending power, the typical remedy for state noncompliance with federally imposed conditions is not a private cause of action for noncompliance but rather action by the Federal Government to terminate funds to the State." <u>Id.</u> at 28.  In <u>Blessing</u>, the Supreme Court articulated a three-factor test to help courts determine whether a statute enacted pursuant to the spending power -- like the statutes at issue here -- created a private right redressable under § 1983: (1) "Congress must have intended that the provision in question benefit the plaintiff", (2) "the plaintiff must demonstrate that the right assertedly protected by the statute is not so 'vague and amorphous' that its enforcement would strain judicial competence," and (3) "the provision giving rise to the asserted right must be couched in mandatory, rather than precatory, terms", <u>Blessing</u>, 520 U.S. at 340-41 (quoting <u>Wright v. City of Roanoke Redev. and Housing Auth.</u>, 479 U.S. 418, 431 (1987)).  Plaintiffs urge us to apply the <u>Blessing</u> test here, <u>see</u> Pl. Resp. in Opp. at 14.

But in <u>Gonzaga</u> the Supreme Court clarified <u>Blessing</u>, noting that while "some courts [had] interpret[ed] <u>Blessing</u> as allowing plaintiffs to enforce a statute under § 1983 so long as plaintiff falls within the general zone of interest that the statute is intended to protect" -- a standard that was "less than what is required for a statute to create rights enforceable directly from the statute itself under an implied private right of action" -- such was not the law.  <u>Gonzaga</u>, 536 U.S. at 283.  Instead, the Supreme Court explained, "We now reject the notion that our cases

permit anything short of an unambiguously conferred right to support a cause of action brought

under § 1983." Id.

        Our Court of Appeals noted that in the wake of Gonzaga satisfaction of the

Blessing test was insufficient to demonstrate a statutorily-conferred private right:

> as is explained in Gonzaga University, the Blessing Test may only
> indicate that plaintiffs "fall[] within the general zone of interest
> that the statute is intended to protect; something less than what is
> required for a statute to create rights enforceable directly from the
> statute itself . . . ." To ensure that Congress unambiguously
> conferred the rights asserted, we must determine whether Congress
> used "rights-creating terms."

Sabree ex rel. Sabree v. Richman, 367 F.3d 180, 189-90 (3d Cir. 2004) (quoting Gonzaga, 536

U.S. at 283-83).

        We thus decline plaintiff's invitation to ignore Gonzaga and solely apply the

Blessing test.  Gonzaga directed courts who are deciding whether a statute contains a right whose

violation gives rise to § 1983 liability to look to the Supreme Court's line of "implied right of

action" cases in order to assess "whether Congress intended to create a federal right."  Gonzaga

at 283 (emphasis in original).[2]  As the Supreme Court explained in Gonzaga, "if Congress wishes

---

        [2] In Gonzaga, the Supreme Court acknowledged that "whether a statutory
violation may be enforced through § 1983 'is a different inquiry than that involved in
determining whether a private right of action can be implied from a particular statute'", id. at 283
(quoting Wilder v. Virginia Hosp. Ass'n, 496 U.S. 498, 508 n.9 (1990)).  As the Supreme Court
explained in Wilder, the implied right of action line of cases reflects the separation of powers
concern that only Congress -- and not the courts -- can create a remedy for a violation of a
federal law.  This concern is not present in a § 1983 analysis where Congress has already created
a remedy through § 1983 itself.  Wilder, 496 U.S. at 508 n.9.  See also Gonzaga, 536 U.S. at 284
("Plaintiffs suing under § 1983 do not have the burden of showing an intent to create a private
remedy because § 1983 generally supplies a remedy for the vindication of rights secured by
federal statutes.").

to create new rights enforceable under § 1983, it must do so in clear and unambiguous terms", id. at 290.

In Gonzaga, the Supreme Court sought to determine whether the Family Educational Rights and Privacy Act of 1974 ("FERPA") created a private right by considering whether the provisions contained "the sort of 'rights-creating' language critical to showing the requisite congressional intent to create new rights", Gonzaga, 536 U.S. at 287 (quoting Alexander v. Sandoval, 532 U.S. 275, 284 (2001)).  The Supreme Court found that the FERPA did not contain "individually focused terminology", and that the statute focused instead on the Secretary of Education's oversight of the statutory funding penalties.  See Gonzaga, 536 U.S. at 287 (quoting Sandoval, 532 U.S. at 289, for the proposition that "[s]tatutes that focus on the person regulated rather than the individuals protected create no implication of an intent to confer rights on a particular class of persons") (further internal quotations omitted).  The Supreme Court next considered FERPA's structure, including its enforcement mechanism and internal review processes, to determine whether that structure reflected a Congressional intent that individuals be able to sue under the Act.  The Court concluded that it did not.  Id. at 289-90.

Thus, as our Court of Appeals has explained in the wake of Gonzaga, in considering whether a statute creates a private right giving rise to § 1983 liability, courts must consider "not only . . . the text of the statute . . . but also its structure."  Sabree, 367 F.3d at 191. See also Newark Parents Ass'n v. Newark Public Schools, 547 F.3d 199, 208 (3d Cir. 2008).

We note, as we will discuss below, that if a statute does not confer a private right its implementing regulations may not be enforced through private suit -- "[l]anguage in a regulation may invoke a private right of action that Congress through statutory text created, but it may not create a right that Congress has not." Sandoval, 532 U.S. at 291.  As the Supreme Court

has made clear, "it is most certainly incorrect to say that language in a regulation can conjure up a private cause of action that has not been authorized by Congress.  Agencies may play the sorcerer's apprentice but not the sorcerer himself."  Id.

In the § 1983 context, a regulation cannot "create a right enforceable through section 1983 where the alleged right does not appear explicitly in the statute, but only appears in the regulation."  South Camden Citizens in Action v. New Jersey Dep't of Environmental Prot., 274 F.3d 771, 781 (3d Cir. 2001).  In other words, "[u]nder Section 1983 . . . regulations give rise to a right of action only insofar as they construe a personal right that a statute creates." Three Rivers Center for Ind. Living, Inc. v. Housing Auth. of the City of Pittsburgh, 382 F.3d 412, 424 (3d Cir. 2004).

## 2.   The United States Housing Act ("USHA")

### a.   Statutory Text

McField here sues under "42 U.S.C. § 1437, specifically including, but not limited to Sections 1437f(o)(8) and 1437d(f) and the Housing Quality Standards implementing regulations found at" 24 C.F.R. § 982.305, 401, 404, 405.  See Am. Comp. ¶ 185.

Section 1437 contains a "[d]eclaration of policy" explaining, inter alia, that "[i]t is the policy of the United States -- (1) to promote the general welfare of the Nation by employing the funds and credit of the Nation . . . to assist States . . . to remedy the unsafe housing conditions and the acute shortage of decent and safe dwellings for low-income families . . . ." § 1437(a).  It also contains provisions for the formation of public housing agencies and their governing bodies. This section clearly speaks in terms of general policy, and it has consistently been held not to create a private right.  See, e.g., Reynolds v. PBG Enterprises, No. 10-4373, 2011 WL 2678589,

at *7-8 (E.D. Pa. July 6, 2011) (Pollak, J.); Hurt v. Philadelphia Housing Auth., 806 F. Supp.

515, 524 (E.D. Pa. 1992) (Giles, J.).

   The only other portions of the statute itself to which the plaintiff refers are

Sections 1437f(o)(8) and 1437d(f) -- which we will consider here.  In his well-reasoned

Reynolds opinion, Judge Pollak analyzed these provisions in light of Gonzaga, and our views

here draw heavily on our late colleague's findings.

   Section 1437f(o)(8) provides that "for each dwelling unit for which a housing

assistance payment contract is established . . . the public housing agency shall inspect the unit

before any assistance payment is made to determine whether the dwelling unit meets the [USHA]

housing quality standards", § 1437f(o)(8)(A).  Public housing agencies are also to conduct

inspections annually while a HAP contract is in place.  See § 1437f(o)(8)(D).  Pursuant to the

implementing regulations, "[t]he PHA may not . . . execute a HAP contract, until the PHA has

determined that . . . [t]he unit has been inspected by the PHA and passes HQS [Housing Quality

Standards]", 24 C.F.R. § 982.305(a).

   In Reynolds, Judge Pollak found that this provision did not create a private right.

He relied on statutory language -- such as "the public housing agency shall inspect the unit", §

1437f(o)(8)(A), and "[e]ach public housing agency providing assistance under this subsection . .

. shall make an annual inspection of each assisted dwelling unit . . . ", § 1437f(o)(8)(D) -- in

finding that "[t]he provisions of subsection (o)(8) . . . focus on the conduct of public housing

agencies as regulated by the Secretary and do not enumerate rights of tenants in the housing that

is to be inspected."  Reynolds, 2011 WL 2678589, at * 8.  Thus, "[i]nstead of language speaking

of obligations to individuals and creating personal rights," Judge Pollak found that

§1437f(o)(8)(D) "speaks only to the housing agencies' obligations pursuant to standards set by"

the Secretary of Housing and Urban Development ("the Secretary").  Id.  He concluded that such

language was "not enough to create personal rights enforceable through § 1983 or through a

private right of action."  Id.  We agree.

Section 1437d(f) provides that "[e]ach contract for contributions for a public

housing agency shall require that the agency maintain its public housing in a condition that

complies with standards which meet or exceed the housing quality standards" established

pursuant to the Act.  § 1437d(f)(1).  The section requires the Secretary to "establish housing

quality standards . . . that ensure that public housing dwelling units are safe and habitable . . .

includ[ing] requirements relating to habitability, including maintenance, health and sanitation

factors, condition, and construction of dwellings . . . ."  § 1437d(f)(2).  Moreover, "[e]ach public

housing agency that owns or operates public housing shall make an annual inspection of each

public housing project to determine whether units in the project are maintained in accordance

with the requirements under paragraph (1)."  Id.

We concur with Judge Pollak's conclusion that § 1437d(f) "focuses on the person

regulated rather than the individuals protected", Reynolds, 2011 WL 2678589, at *8 (quoting

Sandoval, 532 U.S. at 289 (internal alterations omitted)), and so it does not create a private right

enforceable through § 1983.

**b.      Statutory Structure**

The structure of the USHA provisions plaintiff cites does not demonstrate a

Congressional intent to create a private right.  As we described above, §§ 1437, 1437d, and

1437f all speak to the policy of the United States to provide affordable housing to low income

10

people and to outline the process by which the Secretary and local agencies are to accomplish that goal.

Unlike in Wright, where the statute provided a specific entitlement to individuals -- "tenants could be charged as rent no more and no less than 30 percent of their income", Wright, 479 U.S. at 430 -- without providing a mechanism for redress, the provisions cited here do not sound in individual remedy but in organizational mandate.  As the District Court described in Johnson v. City of Detroit, 319 F. Supp. 2d 756 (E.D. Mi. 2004), "the statute focuses on regulating the Secretary and the public housing agencies through the Secretary's promulgation of housing quality standards."  Id. at 764; see also Johnson v. City of Detroit, 446 F.3d 614, 627 (6th Cir. 2006) (endorsing the District Court's reasoning on this point).  The provisions detail the way in which the Secretary and local agencies are to "remedy the unsafe housing conditions and the acute shortage of decent and safe dwellings for low-income families" and the "shortage of housing affordable to" those families.  § 1437(a)(1)(A)-(B).  Neither the language nor the structure of the Housing Act reveals an intent to create a private right.

### 3.   Lead-Based Paint Poisoning Prevention Act ("LBPPPA")

#### a.   Statutory Text

In the portion of the second amended complaint concerning LBPPPA, plaintiff refers to 42 U.S.C. §4801 et seq. and its implementing regulations, see Comp. ¶ 191, and later to 42 U.S.C. §§ 4821-46, see id. ¶ 195, without elaborating on which specific sections of LBPPPA that PHA allegedly violated.  In her allegations concerning how PHA violated this statute and the RLBPHRA, see id., McField does not refer to any regulations that implement LBPPPA.

Without a more specific citation to a provision of the LBPPPA, and given the facts as alleged, we assume plaintiff refers to § 4822 which contains "[r]equirements for housing receiving Federal assistance."  Section 4822 provides that

> The Secretary of Housing and Urban Development . . . shall establish procedures to eliminate as far as practicable the hazards of lead based paint poisoning with respect to any existing housing which may present such hazards and which is covered by . . . housing assistance payments under a program administered by the Secretary . . . [b]eginning on January 1, 1995, such procedures shall apply to all such housing that constitutes target housing . . . and shall provide for appropriate measures to conduct risk assessments, inspections, interim controls, and abatement of lead-based paint hazards.

42 U.S.C. § 4822(a).  This section also obliges the Secretary to "require the inspection of all intact and nonintact interior and exterior painted surfaces of housing subject to this section for lead-based paint . . . ." § 4822(c).

Notably, the language of this section is not individual-focused.  Indeed, it does not come close to including "the sort of rights-creating language critical to showing the requisite congressional intent to create new rights", Gonzaga, 536 U.S. at 287 (internal quotations omitted).  We thus find that § 4822 does not create a private right enforceable under LBPPPA.  We agree with Judge Pollak that "[a]lthough undoubtedly [Section 8] tenants are intended beneficiaries of the LBPPPA, Congress did not use language that confers personal rights on those beneficiaries" because the statute addresses "the person regulated rather than the individuals protected".  Reynolds, 2011 WL 2678589, at *5 (quoting Sandoval, 532 U.S. at 289) (emphasis in original).

   **b.**  <u>Statutory Structure</u>

   As described above, LBPPPA directs the Secretary of HUD to establish procedures to reduce lead-based paint hazards.  The statutory scheme is not one of individual rights and remedies, but of a regulating body -- HUD -- achieving a statutorily-determined goal -- reduction of lead-based paint hazards.  As the Court of Appeals for the Sixth Circuit found, the "overall structure of the statute focuses on the regulating entity's duties, which is too far removed from the interests of individual tenants to confer the kind of individual entitlement that is enforceable under § 1983 in accordance with <u>Gonzaga</u>."  <u>See</u> <u>Johnson</u>, 446 F.3d at 625.  We agree.  The statutory structure bolsters our conclusion based on the statutory text that LBPPPA does not confer a private right.

   **4.**  <u>Residential Lead-Based Paint Hazard Reduction Act ("RLBPHRA")</u>

   **a.**  <u>Statutory Text</u>

   With regard to the RLBPHRA, plaintiff refers to 42 U.S.C. §§ 4851-56 and the implementing regulations at part 35, subparts A, B, M, and R.  Specifically, she refers to 24 C.F.R. §§ 35.94(a), 35.88(a)(2), 35.24(b)(1)-(2), 965.704, 965.710, 882.109(i)(3), 882.209(h)(1), and 882.211(b).

   Because, as we note above, a plaintiff does not have a private right under a regulation if the governing statute does not provide such a right, we will begin by considering whether the RLBPHRA confers an individual right.

   Plaintiff refers broadly to 42 U.S.C. §§ 4851-56.  Section 4851 contains Congressional findings, a description of purposes of the chapter, and definitions, but it does not have any operative provision that would give rise to a private right.  Section 4852 provides for a

grant program; a task force, § 4852a; inter-agency consultation, § 4852b; and criteria for establishing guidelines, § 4852c.  None of these provisions speaks in "individual terms" about any requirement that would create a private right.

Section 4852d requires the Secretary to promulgate regulations requiring that the seller or lessor of housing built before 1978 "provide the purchaser or lessee with a lead hazard information pamphlet", § 4852d(a)(1)(A); "disclose to the purchaser or lessee the presence of any known lead-based paint, or any known lead-based paint hazards", § 4852d(a)(1)(B);  and "permit the purchaser a 10-day period . . . to conduct a risk assessment or inspection for the presence of lead-based paint hazards", § 4852d(a)(1)(C); before "the purchaser or lessee is obligated under any contract to purchase or lease the housing."  § 4852a(1).  Section 4852d(b) provides for civil liability against "[a]ny person who knowingly violates the provisions of this section . . . in an amount equal to 3 times the amount of damages".  § 4852d(b)(3).

As Judge Pollak held in Reynolds, however, several considerations prevent us from here finding a private right redressable by § 1983 in this provision.  First, as Judge Pollak noted, under Blessing the presence of a remedy in the statute likely forecloses the use of § 1983.  See Reynolds, 2011 WL 2678589, at * 6 (quoting Blessing, 520 U.S. at 346-48).  Cf. Three Rivers Center, 382 F.3d at 422 (Congress may foreclose a remedy under § 1983 "by creating a comprehensive enforcement scheme that is incompatible with individual enforcement under § 1983").  More to the point, the statute imposes obligations only on sellers and lessors, see, e.g., § 4852d(a)(1), and it is undisputed that Cassidy, and not PHA, was the lessor here.[3]

---

[3] Reynolds also addressed the issue of standing.  Judge Pollak reasoned that the statute conferred rights only on lessees and purchasers, rather than residents, thereby preventing a minor who was merely a resident from bringing suit.  Here, because other reasons compel dismissal of the Complaint against PHA, we need not parse the question of standing.

The other provisions of §§ 4853 - 4856 could not fairly be read to confer a private right on McField.  See, e.g., § 4853 (regarding "worker protection"); § 4853a ("Coordination Between Environmental Protection Agency and Department of Labor"); § 4854 ("Research on Lead Exposure from Other Sources"); § 4854a ("Testing Technologies"); § 4855 ("Federal Implementation and Insurance Study"); and § 4856 ("Reports of Secretary of Housing and Urban Development").

Although § 4852d(b) may provide a cause of action against Cassidy -- the lessor -- the language of the RLBPHRA does not provide an individual right redressable under § 1983.

### b.    Statutory Structure

Although the RLBPHRA provides for private redress of statutory violations against an owner or lessor, this reality does not suggest a Congressional intent to create a private right with regard to HUD or to local housing agencies.

### 5.    Plaintiff's Objections

Plaintiff argues that "the analysis in Reynolds was not based upon the long-standing Supreme Court analysis set forth in the cases of" Blessing, Wilder v. Virginia Hospital Ass'n, 496 U.S. 498 (1990), and Wright, but instead that "the Reynolds Court created its own standard" when it sought to determine "whether the statutes created new individual rights in clear and unambiguous terms."  Pl. Resp. in Opp. at 10-11 (quoting Reynolds, 2011 WL 2678589, at *12).  Because our analysis here parallels Judge Pollak's in Reynolds, we address McField's objection: Reynolds did not "create[] its own standard" when it required that any private right under USHA be expressed in "clear and unambiguous terms."  Id.  Indeed, this is the exact standard Gonzaga -- which, as we described above, came after and clarified Blessing --

15

articulated: "[i]n sum, if Congress wishes to create new rights enforceable under § 1983, it must do so in clear and unambiguous terms", Gonzaga, 536 U.S. at 290.  Judge Pollak's reasoning in Reynolds was squarely in line with Gonzaga's command, and we endorse that reasoning here.

Plaintiff urges us to look to some cases where, they claim, courts found that the Housing Act created a private right enforceable through § 1983.  In our Circuit, she identifies McKinney v. Philadelphia Housing Auth., No. 07-4432, 2010 WL 1644282 (E.D. Pa. Apr. 20, 2010) (Schiller, J.), vacated, McKinney v. Philadelphia Housing Auth., No. 07-4432, 2010 WL 2510382 (E.D. Pa. June 16, 2010) (Schiller, J.); Paige v. Philadelphia Housing Auth., No. 99-497, 2002 WL 500677 (E.D. Pa. Mar. 28, 2002) (Green, J.)[4]; and Hurt v. Philadelphia Housing Auth., 806 F. Supp. 515, 524 (E.D. Pa. 1992) (Giles, J.).

Neither McKinney nor Hurt persuades us to reach a different conclusion.  To begin, Judge Schiller vacated his first decision in McKinney as a condition of the parties' settlement agreement, see McKinney, 2010 WL 2510382, at *4.  Next, the plaintiffs emphasize that in the first decision, the Court "determined that these very provisions of the USHA 'satisfy all of the Blessing factors.'"  Pl. Resp. in Opp. at 14.  However, in the opinion plaintiffs cite, Judge Schiller found that the Housing Act did not create a private right under the Gonzaga test, the test that ultimately determines whether a statute confers a right redressable under § 1983.  As Judge Schiller wrote in his vacating opinion, "The Court's summary judgment opinion held that

_____

[4] In Paige, the Court accepted without analysis the plaintiffs' assertion "that they have pled violations of the current lead-based paint regulations and that those pleadings are sufficient under the pleading requirements pursuant to Fed. R. Civ. P. 8(a). . . ."  Paige, 2002 WL 500677 at *7.  Without more insight into the Court's reasoning than this pre-Gonzaga opinion reveals, we cannot rely on its conclusion as a basis to undermine our post-Gonzaga reading of the statute and the well-reasoned opinions of other district courts and our own Court of Appeals.

sections 1437f(o)(8) and 1437d(f) of the Housing Act . . . are not privately enforceable because they do not create personal rights."  McKinney, 2010 WL 2510382, at *3 (emphasis added). Like Judge Schiller, in looking for a statutorily-created private right we cannot ignore the Supreme Court's Gonzaga precedent by applying only the Blessing factors.  McKinney thus bolsters our decision.

In Hurt -- decided before Sandoval or Three Rivers, and so lacking the benefit of those cases' clarity on the status of rights created under regulations -- Judge Giles found that the USHA and LBPPPA regulations in place at the time

> require[d] local housing authorities which receive funds from HUD to inspect the units under their management for lead-based paint and to cover or remove such paint where found.  Unlike the general policy provision of § 1437, such anti-lead-poisoning measures are specific, affirmative obligations akin to the rent ceiling provision at issue in Wright.  Because they do not suffer from the general policy language vagueness of § 1437, these regulatory provisions create rights in plaintiffs enforceable under § 1983.

Hurt, 806 F. Supp. at 525-26.  Judge Giles noted in a footnote, "[i]t does not matter that the obligations at issue are created by regulation rather than by statute."  Id. at 525 n.14.  In support, Hurt cited Holly v. Housing Authority of New Orleans, 684 F. Supp. 1363, 1366 n.8 (E.D. La. 1988), a pre-Gonzaga case where the court found that "Wright involved a claim that a local public housing agency had violated both the Brooke Amendment to the Housing Act and its implementing regulations."  But Holly's reference to Wright -- where the Court found both the statute and the regulations to confer a right -- is not relevant today in the context where only the regulations and not the statute confer a right.  As we explained above, it is now settled that where the statute does not confer a right, the regulations cannot do so.  See, e.g., Sandoval, 532 U.S. at 284.

Unpersuaded by plaintiff's arguments to the contrary, we thus find that the provisions of the Housing Act, LBPPPA, and RLBPHRA that we consider here do not confer a private right, and plaintiff therefore may not sue the PHA under § 1983 to redress alleged violations of these provisions.

**B.    Plaintiff's Claims of State-Created Danger And
       <u>Violations of Her Due Process and Equal Protection Rights</u>**

Count IV of the second amended complaint refers to "Civil Rights: State Created Danger Pursuant to 42 U.S.C. § 1983", and Count V (erroneously labelled Count IV a second time) refers to a "Violation of Due Process Pursuant to 42 U.S.C. § 1983."  In Count V, plaintiff alleges that she "have [sic] been deprived of her right to property, due process of law and equal protection under the law", and that "PHRA deprived plaintiffs of their [sic] rights pursuant to the Fifth and Fourteenth Amendments to the United States Constitution."  Comp. ¶¶ 223-24.

PHA argues that "[a]lthough not explained by Plaintiffs, these claims are actually related, in that a state-created danger is a limited exception to the general rule" that "the due process clauses of the Fifth and Fourteenth Amendments do not impose an affirmative obligation on a state to protect its citizens", Def. MTD at 16, 18.

We begin by noting that plaintiff's Fifth Amendment claim fails because the Fifth Amendment restricts only the federal government and does not apply to the actions of states or local agencies such as PHA.  <u>See, e.g.</u>, <u>Citizens for Health v. Leavitt</u>, 428 F.3d 167, 178 n.11 (3d Cir. 2005) ("In a due process claim brought under the Fifth Amendment, the 'State' in the state action analysis is the federal government") (quoting <u>Malloy v. Hogan</u>, 378 U.S. 1, 26 (1964), for the proposition that "[d]ue process of law is secured against invasion by the federal Government by the Fifth Amendment, and is safeguarded against state action in identical words by the

18

Fourteenth") (further internal quotations omitted).  We will thus dismiss Counts IV and V to the extent they allege violations of the plaintiff's Fifth Amendment rights.

Turning to plaintiff's Fourteenth Amendment claim, McField does not allege that PHA denied her housing free of lead-based paint hazards without providing sufficient <u>procedural</u> safeguards.  Thus she makes a substantive rather than a procedural due process claim.  <u>See, e.g.</u>, <u>DeShaney v. Winnebago County Dept. of Social Services</u>, 489 U.S. 189, 195 (1989).

As the Supreme Court held in <u>DeShaney</u>, "nothing in the language of the Due Process Clause itself requires the State to protect the life, liberty, and property of its citizens against invasion by private actors."  <u>Id.</u>  Instead, "[t]he Clause is phrased as a limitation on the State's power to act, not as a guarantee of certain minimal levels of safety and security."  <u>Id.</u>

Our Court of Appeals has nevertheless "recognized that a state actor may be held liable [for violations of substantive due process] under the 'state-created danger' doctrine for creating a danger to an individual in certain circumstances."  <u>Henry v. City of Erie</u>, 728 F.3d 275, 281 (3d Cir. 2013).  <u>See also</u> <u>DeShaney</u>, 489 U.S. at 200.  To establish a claim under this "state-created danger" exception, a plaintiff must plead four elements:

(1)    the harm  ultimately caused was foreseeable and fairly direct;

(2)    a state actor acted with a degree of culpability that shocks the conscience;

(3)    a relationship between the state and the plaintiff existed such that the plaintiff was a foreseeable victim of the defendant's acts, or a member of a discrete class of persons subjected to the potential harm brought about by the state's actions, as opposed to a member of the public in general; and

(4)    a state actor affirmatively used his or her authority in a way that created a danger to the citizen or that rendered the citizen more vulnerable to danger than had the state not acted at all.

Henry, 728 F.3d at 282 (quoting Morrow v. Balaski, 719 F.3d 160, 177 (3d Cir. 2013)) (further internal quotations omitted).  Henry cautioned that the state-created danger doctrine is "a narrow exception to the general rule that the state has no duty to protect is citizens from private harms." Id. at 286.

In Henry our Court of Appeals considered a state-created danger claim where a tenant and her guest died of smoke inhalation caused by a fire in her Section 8 apartment, which purportedly lacked a smoke detector and an alternate exit (like a fire escape) in violation of HUD regulations.  Id. at 277.  Our Court of Appeals found that plaintiffs could not get beyond the first step of the state-created danger test because the housing authority's alleged error -- improperly approving the apartment for the Section 8 program and then improperly allowing it to pass subsequent Section 8 inspections even though it lacked a smoke detector and fire escape -- was not "a fairly direct cause of decedents' harm", id. at 283 (internal quotations omitted).[5]  The Court explained that "improper licensure will often be too far removed from the ultimate harm to permit liability under § 1983" because in order to show that state officials' conduct was a "fairly direct" cause of the injury "the plaintiff must plausibly allege that state officials' actions precipitated or were the catalyst for the harm for which the plaintiff brings suit."  Id. at 284-85 (internal quotations and alterations omitted).  The Court concluded that the housing authority's "approval and subsidization" of the apartment was not a fairly direct cause of the fire because "[d]efendants' actions were separated from the ultimate harm by a lengthy period of time and

---

[5] With regard to the first prong of the first question -- whether the harm ultimately caused was foreseeable -- the Court found that it was, reasoning that "[b]y establishing basic safety requirements for Section 8 housing, the Housing Quality Standards are intended to guard against foreseeable hazards", and that "[m]ost cases involving failure to comply with health and safety standards will meet the hurdle of foreseeability."  Henry, 728 F.3d at 283.

intervening forces and actions." Id. at 285.  Moreover, Henry held that it was the lessor's responsibility to comply with the Housing Quality Standards -- rather than the housing authority's -- by installing a smoke detector and fire escape.  Id.

The analysis here tracks Henry's.  Although McField asserts that PHA "[a]ctively created a known unsafe, toxic and hazardous condition for plaintiffs' health and safety", Comp. ¶ 190 (zzz), the substance of her factual allegations seem to amount to the claim that the PHA failed by improperly approving and insufficiently inspecting the property, see Comp. ¶ 195(a) - (l); ¶ 210 (a) - (e).  As in Henry, PHA's authorization of 2040 South 68th Street for the Section 8 program and its failure to identify the lead-based paint hazard during subsequent inspections, though undoubtedly lamentable, was not a "fairly direct" cause of McField's harm.  Taking as true the facts as alleged, any erroneous PHA approval and insufficient inspections were separated from the ultimate harm to McField by time and by the intervening inaction of Cassidy's alleged failure to comply with the HQS regarding lead paint removal.  We will therefore dismiss plaintiff's due process claim based on the "state-created danger" exception.

We turn finally to plaintiff's equal protection claim.  As our Court of Appeals has explained, a § 1983 claim based on a denial of equal protection requires plaintiffs to "prove the existence of purposeful discrimination", Andrews v. City of Philadelphia, 895 F.2d 1469, 1478 (3d Cir. 1990) (citing Batson v. Kentucky, 476 U.S. 79, 93 (1986)).  A plaintiff must also "demonstrate that they received different treatment from that received by other individuals similarly situated."  Id. (internal quotations omitted).  Plaintiff's second amended complaint does not allege any facts that would suggest that McField received different treatment from other, similarly situated individuals or that she experienced any purposeful discrimination.  We will therefore dismiss plaintiff's equal protection claim.

### C.    Plaintiff's Monell Claim

McField labels Count III "Civil Rights: <u>Monell</u> Claim Pursuant to 42 U.S.C. § 1983", a reference to <u>Monell v. Dep't of Soc. Servs.</u>, 436 U.S. 658 (1978), which holds that a local government may be liable under § 1983 "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy" violates an individual's constitutional rights.  <u>Id.</u> at 694.  Because we have found here that plaintiff has failed to allege a violation of her statutory or constitutional rights, there can be no <u>Monell</u> liability.

## V.    Conclusion

Judge Barry's observation in <u>Sabree</u> is apt here: "That plaintiffs merit sympathy does not escape our notice, but neither does it govern our reasoning."  <u>Sabree</u>, 367 F.3d at 183. Plaintiff's allegations of lead poisoning without doubt paint a grim picture, and McField may yet find relief, but she must do so outside of the strictures of § 1983.

For the reasons articulated herein, plaintiff's second amended complaint does not "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face'", <u>Iqbal</u>, 556 U.S. at 678 (quoting <u>Twombly</u>, 550 U.S. at 570), and so we will grant PHA's motion to dismiss.

BY THE COURT:


 _/s/ Stewart Dalzell, J.
Stewart Dalzell, J.